# COMPOSITE EXHIBIT "C"
## PLAINTIFFS' FIRST MOTION IN LIMINE AND MEMORANDUM OF LAW

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO:   3:07-CV-1180-J-TEM

JAMES E. TOMLINSON and DARLENE
TOMLINSON, his wife,

          Plaintiffs,

vs.

WILLIAM J. LANDERS,

          Defendant.
_____/



DEPOSITION OF:              Rowland Lamb, P.E.

TAKEN AT THE INSTANCE OF:   Plaintiffs

DATE:                       Wednesday, June 10, 2009

TIME:                       Commenced at 10:03 a.m.
                            Concluded at  2:00 p.m.

LOCATION:                   2894 Remington Green Lane
                            Tallahassee, Florida

REPORTED BY:                Kimberly S. Bartholomew
                            Court Reporter

ACCURATE STENOTYPE REPORTERS, INC.
2894-A REMINGTON GREEN LANE
TALLAHASSEE, FLORIDA 32308    (850)878-2221

APPEARANCES:

       REPRESENTING PLAINTIFF:


STRIPLING & STRIPLING, P.A.
BY:  ROBERT O. STRIPLING, JR., ESQUIRE
102 Northwest Second Avenue
Gainesville, Florida 32602




       REPRESENTING DEFENDANT:


MARKS GRAY, P.A.
BY:  ROBERT H. STURGESS, ESQUIRE
1200 Riverplace Boulevard
Suite 800
Jacksonville, Florida 32207

1    your drawing that you provided that is dated 3-31-09, it

2    shows what is there or what you believe to be there when

3    you were out at the scene; is that right?

4        A    That's correct.

5        Q    All right.  You really don't know what was

6    here at the time of the accident in this case, do you?

7        A    I was not there immediately following the

8    crash.  I only know what was there when I went out

9    there.

10       Q    Okay.  And you haven't examined any documents

11   that would tell you what was there at the time of this

12   accident in February of 2007, have you?

13       A    Well, now I have looked at some documents, and

14   I don't know that they actually told me so much as what

15   was there as to what has been replaced.  These are

16   maintenance documents.

17       Q    Do you have knowledge of what was installed?

18       A    I'm trying to recall.  Well, I do know that

19   the signs that are there I know how long they have been

20   there.

21       Q    This is the signs that were there on what

22   date, the date of your diagram?

23       A    Yes, sir.

24       Q    March 31st, 2009.  More than two years after

25   this accident, you know what was there then and how long

ACCURATE STENOTYPE REPORTERS, INC.

1   it had been there; is that right?

2       A    That's correct.

3       Q    All right.  But you don't know what was there

4   on the day of the accident, correct?

5       A    That's correct.

6       Q    And so you don't really have any opinions

7   about whether or not the signs on the day of the

8   accident at Alligator Boulevard and State Road 21 were

9   adequate or not, do you?

10          MR. STURGESS:  Object to the form.

11      A    Well, it's my opinion that if there were other

12  signs out there they would have been maintained had they

13  been out there.

14          Working for the Department of Transportation

15  for 16 years I have some knowledge of how they function

16  and work.

17  BY MR. STRIPLING:

18      Q    All right.  Let me just try to clarify my

19  question.

20      A    Okay.

21      Q    Am I correct that you do not have any opinions

22  about -- since you don't know what signs were there on

23  the day of the accident you don't have any opinions

24  about whether or not the signs on the day of the

25  accident at that intersection were adequate, correct or

1  incorrect?

2      A    Only based on the information that I have.

3      Q    Well, that doesn't answer my question.  I

4  think you know what I'm trying to ask you.  I'm trying

5  to narrow down what it is your opinions are in this

6  case.

7          Now, I want to be clear.  Since you don't know

8  what signs were there on the day of the accident at

9  Alligator or at Rosemary you don't know whether or not

10  those signs were adequate; am I correct?

11          MR. STURGESS:  Object to the form.

12      A    I'll answer it this way.  I don't know if

13  there were any other signs there other than the ones

14  that I witnessed on the day of my inspection.

15  BY MR. STRIPLING:

16      Q    So you don't know if the signs were adequate

17  on the day of the accident, correct?

18          MR. STURGESS:  Object to the form.

19      A    I hate to go along with you on that because I

20  believe that the signs that were there on the day of my

21  inspection are the same ones and there were no other

22  ones there at the time of the accident, but I don't know

23  that.  I have no proof at this point other than

24  maintenance records that certainly show there were none

25  ever repaired or replaced so I have to believe that

ACCURATE STENOTYPE REPORTERS, INC.

1    there weren't.

2         I mean, to me that is substantial to show that

3    there were no other signs out there because I have

4    maintenance records that show that there were none that

5    were removed, repaired or replaced.  So based on that

6    the signs that were there at the point of my inspection

7    were there at the time of the accident.

8    BY MR. STRIPLING:

9         Q    All right.  You know what signs I assume,

10   correct me if I'm wrong, do you know what signs planned

11   to be installed at Alligator and State Road 21?

12        A    When you say planned?

13        Q    Designed to be there.

14        A    I've never seen the design plans for that

15   intersection.

16        Q    Okay.  And you've never requested those; is

17   that correct?

18        A    That is very possibly correct.

19        Q    Are you here today prepared to give your

20   opinions in this case?

21        A    Yes, sir.

22        Q    All right.  I see you are making notes now

23   right after I asked you that question.  Is it now going

24   to be your intention to go out and try to get the design

25   plans so that you can be prepared to answer a question

```
 1    like that at trial?

 2        A     Well, I think I probably will, yes, sir.

 3        Q     All right.

 4        A     Unless I am instructed otherwise.

 5        Q     Not all right.  I'm disagreeing that you have

 6    the right to do that at this point for the record.  I'm

 7    not trying to argue with you personally, I just wanted

 8    my record clear when I said all right, that it's not all

 9    right.

10        A     I understand, Mr. Stripling, what you're

11    saying.

12        Q     Okay.  And you don't have any as built plans

13    either, do you, to show what the plan was at that

14    intersection regarding signs as it was actually

15    installed and built; is that correct?

16        A     That's correct.

17        Q     And having been with DOT you know that there

18    are design plans and there are as built plans on all

19    projects, correct?

20        A     No, sir, that is not correct.

21        Q     Okay.  You would expect that on a State road

22    such as what we're talking about in this case that there

23    would be as built plans, would you?

24        A      I don't recall when this road was built or

25    when the last construction date was, but I know that as
```

ACCURATE STENOTYPE REPORTERS, INC.

1    correct, and that that sign could have been knocked off.

2         Q    That is what it was designed for, for there to

3    be a divided highway sign below that stop sign on

4    Alligator?

5         A    As I've already said, I have not seen the

6    design plan so I don't know what it was designed for.

7    But if one sign is hit then the other sign is going to

8    be hit, too.  I mean, you've got a stop sign that has

9    been there since May of -- I don't know.  I mean, it

10   doesn't make sense that it would happen that way, but

11   maybe it could.

12        Q    It would depend on the height of the vehicle

13   under my hypothetical, wouldn't it?

14        A    I guess what you are asking is, is there any

15   way that a sign could get knocked off without the sign

16   post showing any impact point or anything, and you know,

17   there is always extenuating circumstances.  I can't say

18   that couldn't happen.  I can't imagine what the

19   circumstances would be, but I can't say that it couldn't

20   happen.

21        Q    Did you furnish to me with the Subpoena all

22   the documents that are in your file in compliance with

23   the Subpoena that we talked about earlier?

24        A    Yes, sir, I did.

25        Q    All right.

1    A    March 31st, 2009.

2    Q    All right.  Do you recall what time you were

3  there?

4    A    I was there for several hours.  Probably from

5  about 4:00 until around 8:30.

6    Q    Was it daylight during the entire time or had

7  it gotten -- I can't remember when we switched over.

8    A    I stayed until 30 minutes beyond dark.

9    Q    Why were you there after dark?

10   A    Well, this crash happened at night time in

11  dark conditions so I wanted to witness the scene at

12  night.

13   Q    Your criticisms are not that there should have

14  been more ambient lighting at the intersection?

15   A    No, sir.

16   Q    Have you ever talked to Mr. Landers --

17   A    No, sir.

18   Q    -- the driver of the vehicle that Mr. Sturgess

19  represents?

20   A    No, sir, I have not.

21   Q    All right.  And have you read his testimony,

22  his deposition testimony?

23   A    I'm trying to remember if I read his.  I know

24  that I read his son's.  This is embarrassing, I ought to

25  know that.  No, sir, I have not.

ACCURATE STENOTYPE REPORTERS, INC.

1       Q     Okay.  You have no way of knowing what

2    Mr. Landers saw or observed at the time of this

3    accident, do you?

4              MR. STURGESS:   Object to the form.

5       A     Well, at the time of the accident, at the

6    moment of the accident?

7    BY MR. STRIPLING:

8       Q     And immediately preceding.

9       A     Well, I don't know everything.  You know,

10   obviously, he doesn't remember and I wasn't in his head

11   at the time so I'm not sure what he was perceiving.

12      Q     All right.  And so you don't know what he was

13   doing at the time of the accident, do you?

14             MR. STURGESS:   Object to the form.

15      A     I understand he was driving his car.

16   BY MR. STRIPLING:

17      Q     All right.  You don't know where he looked or

18   if he stopped at the stop sign; is that right?

19      A     I have no indication one way or another.

20      Q     All right.  If there had been the other signs

21   that you are proposing as per your Rule 26 Report and

22   Affidavit, you don't know if those would have changed

23   the outcome in this case regarding this accident, do

24   you?

25      A     I feel like I can state within a reasonable

ACCURATE STENOTYPE REPORTERS, INC.

1    references some signs, but can you tell me what this is

2    (indicating)?

3        A    Well, it's like a summary of work that they

4    were doing.  But it's not giving enough information to

5    tell us exactly where that is or even when it occurred.

6        Q    Okay.

7        A    I'm sure they were -- you know, they are

8    fulfilling their request of production of material.

9        Q    All right.  Now, also in these materials are

10   accident reports.  In addition to the accident that we

11   have there are accidents, accident reports, that are

12   other times and places.  Is there anything about these

13   accident reports that you are relying upon in forming

14   your opinions in this case?

15       A    No, sir, I'm not relying on these.  It is just

16   part of my file.

17       Q    So any crash reports that are in your file

18   with the possible exception of the one pertaining to

19   this accident, our accident, you do not rely upon just

20   for the record, right?

21       A    That is correct.

22       Q    Okay.  Let's go with your opinions.  Are they

23   the same in the Rule 26 Report as they are in the

24   Affidavit?

25       A    They are.

1           MR. STRIPLING:   Sure.

2           (Thereupon, a brief discussion was held off

3      the record.)

4  BY MR. STRIPLING:

5      Q     Have you read Tomlinson's deposition or Deputy

6  Fryer's (phonetic) deposition?

7      A     My recollection is that I have; but, quite

8  honestly, it was not in my file when I started preparing

9  for this deposition and I did not request it further.   I

10 was focusing on other things at the time.   But I was

11 thinking that I had read those depositions, but they are

12 not in my file.

13     Q     Just looking at your Rule 26 opinion, trying

14 to move on here, your first opinion is the route that

15 Landers took was from his son's house down Alligator,

16 left turn onto Blanding into the southbound lanes,

17 correct?

18     A     That's correct.

19     Q     And the collision was at Rosemary just north

20 of Alligator.

21           The second opinion is that the placement of do

22 not enter, wrong one, one way and divided highway signs

23 would have mitigated any confusion and uncertainty while

24 providing clear and concise information to Mr. Landers

25 thus allowing him the full opportunity to correctly

ACCURATE STENOTYPE REPORTERS, INC.

1    enter the northbound lanes of Blanding Boulevard.

2             Now, you don't say here that these were

3    required so that was not part of your Rule 26 opinion;

4    is that correct?

5        A    Let me see.  I am just looking at all my

6    opinions.  Well, I don't state it there; but, based on

7    the MUTCD the do not enter sign was required.

8        Q    All right.  So you would agree that it was not

9    part of your Rule 26 Report or your Affidavit that it

10   was required to have the do not enter, wrong way, one

11   way and divided highway signs; but, your opinion was

12   only that it would have mitigated any confusion and

13   uncertainty; is that correct?

14       A    That is correct, that the language of

15   requirement does not fall in my opinion.

16       Q    And you did not opine in your Rule 26 Report

17   or your Affidavit that DOT or Clay County deviated from

18   the standard of care by failure to have those signs, do

19   not enter, wrong way, one way and divided highway; is

20   that correct?

21       A    The report does not state that specifically,

22   that's correct.

23       Q    And mitigating any confusion with Mr. Landers

24   it requires you to know what Mr. Landers was thinking at

25   the time that he pulled up to that intersection,